**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Archer PARR, Defendant-Appellant.**

No. 74–2628.

United States Court of Appeals, Fifth Circuit.

July 24, 1975.

Rehearing Denied Sept. 10, 1975.

459

James R. Gillespie, San Antonio, Tex., Charles A. McNelis, Washington, D. C., for defendant-appellant.

William S. Sessions, U. S. Atty., John E. Clark, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM and DYER, Circuit Judges and KRAFT *, District Judge.

WISDOM, Circuit Judge:

Archer Parr appeals his conviction on six counts of an indictment charging him with knowingly making false material declarations before a federal grand jury, in violation of 18 U.S.C. § 1623.[1]

Duval County lies in the arid southern part of Texas. Since 1959, the County Judge there, who is also the chief administrative and budget officer for the county, has been Archer Parr. The record makes it clear that he and his uncle, George Parr, were powerful political figures in Texas, and certainly the most influential men in Duval County. Water is important and was in short supply in that part of the country in the early 1960's. In Duval County the water and sewer system of the City of Benavides was a shambles, the facilities in San Diego were inadequate, and several communities of this Spanish-speaking area were without water entirely. Some years earlier Benavides had defaulted on its municipal bonds, infecting every governmental unit in the area with an unfavorable bond rating. There did exist a nonfunctioning water district, the Jim Wells and Duval County Conservation & Reclamation District. Archer Parr, Fender, a bond dealer, and Gibson, an attorney and specialist in municipal bonds, put together a new political entity, the Duval County Conservation & Reclamation District (the District), to succeed the defunct entities, and to obtain a reasonably good credit rating for the District's

bonds.[2] The group had to secure legislation amending the statute covering the geographic area; arrange for the District to buy the bonds floated by the City of Benavides; divest the District of its gas facilities; testify at state hearings and file pertinent documents; provide for elections in the various political subdivisions; elect a board of directors; let drilling contracts; prepare a budget, a bonded indebtedness schedule, and a tax collection schedule; set up books; and provide for an assessment of property. The record shows beyond dispute that Archer Parr assisted in all of these. Gibson's law firm was paid a $75,000 fee. An engineering firm was paid $56,000. Fender made a handsome profit by marketing the bonds after purchasing them at their face value of $2,500,000. George and Archer Parr were paid $210,000 by Fender for their City of Benavides bonds, which were barred in bankruptcy.[3] There is no record of any payment to Archer Parr for his services, although Gibson testified that he was entitled to "a substantial fee".

The District's first board of directors, set up in 1965, consisted of Chapa, Garza, Julio Benavides, and Tovar. Benavides and Tovar are dead. The record shows that Tovar really ran the District; the other directors were figureheads. All checks were signed by Chapa and Tovar. The board hired Leopoldo Sepulveda as the office manager. His duties included reconciling the books at the First State Bank of San Diego, where the records were kept, and preparing checks to pay bills in the ordinary course of business. Mrs. Ellis, Archer Parr's half sister, also worked in the office. George Parr was retained as the District's lawyer at $1,000 per month.

* Senior District Judge of the Eastern District of Pennsylvania, sitting by designation.

1. 18 U.S.C. § 1623(a), in pertinent part, reads: "Whoever under oath in any proceeding before or ancillary to any . . . grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. After the default on the City of Benavides bonds, all Duval County securities were rated BB by Moody's. The new water district's bonds were rated BAA.

3. George Parr received $40,000, and Archer Parr received $170,000.

In May 1972 a federal grand jury began looking into the affairs of the District, apparently to discover if George Parr was enriching himself through the District without paying income taxes on the benefits. In the course of its investigation, the grand jury discovered a secret account, called the "Special Account" or the "Reserve Account", known only to the bank president Goldthorn, Tovar, Archer Parr, and George Parr. The record shows that every payment, not considering those to Archer Parr, was for an illegal purpose. For example, money flowed from this account for the improvement of George Parr's ranch,[4] the payment of a $57,850 promissory note made by Archer Parr's mother with the bank, and the drawing of a check for $2500 payable to Archer Parr's stepfather some 20 years after his death.[5] George Parr was indicted and convicted for income tax evasion. That conviction was affirmed. United States v. George Parr, 5 Cir. 1975, 509 F.2d 1381.

The grand jury foreman testified that the jury suspected that five payments to Archer Parr between 1966 and 1969 out of the Special Account, totalling $81,700, and denominated payments for legal fees, were really for the benefit of George Parr. This suspicion was based on the familial relationship between Archer and George Parr, the fact that they were once business partners, and their political association. Archer Parr appeared twice, asserted that these payments were legal fees, and disclosed in a letter between his grand jury appearances that he received a sixth payment of $39,800, out of the Operating Account on April 13, 1970, that was also a legal fee. In all Archer Parr received $121,500 from the District.[6]

At Archer Parr's first appearance, he denied being employed by the District to

---

4. These included six miles of aluminum irrigation pipe, 100 tons of fertilizer, over 1,000 gallons of brush killer, and a helicopter & pilot to spray the brush killer.

5. Some of this testimony is inflammatory. The trial judge, however, continually and forcefully instructed the jury that the only crime for which Archer Parr was being tried was perjury, and that the evidence was only to be considered to determine motive.

6. The documentary evidence concerning the six payments may be summarized as follows:

| Gov't Exh. No. | Date | Amount | Nature of Instrument | Account | Explanation On Face |
|---|---|---|---|---|---|
| 5 | 2/ 2/68 | $14,000 | Advice of Charge | Special | To transfer funds to Archer Parr, as per instructions of Archer Parr. |
| 6 | 2/13/68 | 14,000 | Check | Special | Legal services rendered in 1967 |
| 7 | 2/ 7/69 | 15,000 | Check | Special | Legal services rendered year 1968 |
| 8 | 6/17/69 | 23,700 | Advice of Charge | Special | To transfer funds to Archer Parr, as per instructions from District |
| 9 | 4/13/70 | 39,800 | Check | Operating Fund | Legal fees |
| 10 | 6/19/70 | 15,000 | Advice of Charge | Reserve Fund | Advance to Archer Parr on legal fees. |

handle the legal work connected with its inception. He further stated that he had had nothing to do with the District for five or six years. He promised to provide any documentary evidence of his legal work and information of any payments he may have received from the District. By the time Archer Parr returned to the grand jury, it had decided to indict George Parr. Nonetheless, the grand jury questioned Archer Parr again about the purpose of the five payments out of the Special Account and about the sixth payment out of the Operating Account disclosed in Archer Parr's letter to the United States Attorney. Archer Parr also reported that he had no records, memoranda, calendars, briefs or other documents to substantiate his earlier statement that he was paid for legal services. The grand jury concluded that these payments were not for legal services, and indicted him on six counts of perjury.[7]

7. Archer Parr's false statements are the following italicized answers before the grand jury:

COUNT 1:

Q All right. Your letter of October 25 reflects from your records the dates and amounts of deposits to your bank account from the conservation and reclamation district here on the first page of it, I believe.
A That's correct, sir.
Q And it lists a deposit of $14,000 on February 2, 1968; a deposit of $14,000 on February 19, 1968; a deposit of $15,000 on February 10, 1969; a deposit of $23,700 on June 17, 1969; a deposit of $39,800 on April 13, 1970; and a deposit of $15,000 on June 19, 1970. Correct?
A Yes, sir, that's correct. In other words, I went back through my bank statements for the years that you gentlemen requested and picked these figures out of my bank statements over there which was reported on my income tax and then submitted this list to you all, yes, sir.

       *     *     *     *     *     *

Q All right. Were all of those amounts paid to you as compensation for legal services rendered?
A *That's correct, Legal services and also helping them prepare their budget, and more than anything, collection of ad valorem taxes and assisting them in paying off and setting up their bonded indebtedness schedule.*

COUNT 2:

A Mr. Parr, I'll show you another debit memorandum, also on the Duval County Conservation-Reclamation District Special Account. This one is dated June 17, 1969. It's in the amount of $23,700, and the explanation on the face of it is "to transfer funds to Archer Parr as per instructions from district." Do you have a recollection of that transaction?
A Yes, sir, sure do.
Q All right. Could you tell the grand jury what that's all about?
A *A legal fee, sir, for paying me.*
Q All right. What was the nature of the services rendered?
A *Budget, work, studying up books. Just general legal work, sir.*

COUNT 3:

Q Mr. Parr, I'll show you another debit memorandum. This one is drawn on the Duval County Conservation and Reclamation District Reserve Account Fund dated June 19, 1970, in the amount of $15,000, and the identification on the face of it says "Advance to Archer Parr as legal fees." Now, did you receive that sum, sir?
A *I possibly did, sir. If I did, I'm sure I paid income taxes on it.*
Q Well, I suppose that would have been credited to your checking account?
A I suppose so, sir.
Q What was the occasion for an advance on legal fees?
A I don't know, sir.
Q Well, did you request an advance?
A *No, sir, I didn't request an advance for legal services that I'd already rendered. There wasn't an advance on any legal fees.*
Q Did you have any conversation with anyone at the conservation district in June of 1970 about paying a $15,000 legal fee?
A *Yes, sir, sure did.*
Q In other words, that was a legal fee that was due and owing to you?
A *Due and owing to me.*
Q Not an advance?
A *That's why when you said "advance," that's why I kind of hesitated on that. It was something that was already done.*

COUNT 4:

Q Mr. Parr, do you have any idea how much time in representation of the conservation and reclamation district it may have involved on your part in 1968, '69 and—'67 on?
A *I would say that I devoted at that particular time approximately three months per year to the district. By that I mean, sir, exclusive time.*

COUNT 5:

Q Who from the conservation and reclamation district conferred with you, received advice?
A *All of them did, sir.*

Archer Parr was tried before a jury, found guilty, and sentenced to a total of 10 years in prison and fined $60,000.[8] We affirm.

## I

## THE SUFFICIENCY OF THE EVIDENCE

The principal issue in this appeal is the sufficiency of the evidence. This issue compels a close study of the record.

Archer Parr asks whether it is possible to prove beyond a reasonable doubt that someone did *not* do something. The gist of his argument is: "Absence of evidence of services—legal and otherwise—is not evidence that Parr did not in fact perform services—legal and otherwise". The problem is complicated by the fact that the one person in the best position to know whether Archer Parr was being paid for his legal work, Jose Tovar, is dead. Archer Parr put it another way before the district court. He proved that he did *some* legal work, and that therefore he may be guilty of overcharging the District. This, he asserts, may

Q All of the board of directors?
A *Yes, sir.*
Q In what fashion?
A *Well, we'd meet and they would bring up certain problems and we would discuss the problems.*
Q Where were these meetings held?
A *Lots of them were held over in my office, sir.*
Q With the entire board present?
A *No. Sometimes just be two or three of them there. They would ask me a specific point and I would say, "Gentlemen, I don't know," and go back to the books and find out.*
Q How often?
A *Two or three times a week.* Sometimes I wouldn't see them for two or three weeks.
COUNT 6:
Q I'm asking you what legal services you performed for legal services between February of '69 and June of '69 for legal services, specifically if you will, please.
A If that deposit was made into my bank account, sir, which I assume that it was, sir, *it was for legal services.*
Q I asked you what you performed for it. That's four months of work.
A *I did legal services, sir.*

be a crime, but it is not perjury. As is often the case, however, the outcome may turn on the way the issue is phrased. The real issue for the jury was whether the six payments in question were for legal services, not whether Archer Parr performed any legal services.

United States v. Warner, 5 Cir. 1971, 441 F.2d 821, 825, 831 sets out the test for the sufficiency of the evidence as follows:

On a motion for judgment of acquittal, the test is whether, taking the view most favorable to the Government, a reasonably-minded jury could accept the relevant evidence as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.

\* \* \* \* \* \*

The same test . . . should apply whether the evidence is direct or circumstantial

\* \* \* \* \* \*

[W]e must accept as established all reasonable inferences that tend to sup-

Q What legal services?
A *Well, advice,* and it wasn't necessarily just for that four-month period of time, sir. In other words, I bill these people when I need the money.
Q You just indiscriminately pick a sum out of the air?
A No, sir.
Q What was the service you performed between February of 1969 and June of '69?
A *Legal services.*
Q What?
A *All types.*

8. On May 20, 1974, Archer Parr was sentenced to five years imprisonment and fined $10,000 on each of the six counts of the indictment. The sentence of imprisonment imposed on Count Two runs consecutive with the prison sentence imposed on Count One with the recommendation that Parr be committed to the Penitentiary at Leavenworth, Kansas. The prison sentences imposed on Counts Three, Four, Five and Six run concurrently with one another and with the prison term imposed on Count Two and consecutive to the term imposed on Count One.

port the action of the jury, and any conflicts in the evidence must be resolved in favor of the jury verdict.[9]

We must keep in mind that our review does not turn on whether this Court thinks the evidence is sufficient, but whether a reasonable jury could so conclude beyond a reasonable doubt. *See* 2 C. Wright, Federal Practice & Procedure § 467 at 259. Issues of credibility, the weight of evidence, and conflicts in evidence are, of course, matters for the jury. *See* 4 Jones on Evidence §§ 29:9–13 (6th ed. 1972). Furthermore, a jury may believe only part of a story, and disbelieve another part. United States v. Edwards, 5 Cir. 1974, 488 F.2d 1154, 1158. The standard of proof is the same in a § 1623 perjury case as any other criminal case. Indeed Congress made it clear that § 1623,[10] enacted as part of the Organized Crime Control Act of 1970, was intended to facilitate perjury convictions. H. R. No. 91–1549, 1970 U.S.Code Cong. & Admin.News, pp. 4008, 4024. *See* United States v. Lardieri, 3 Cir. 1974, 506 F.2d 319, 323.

The defendant actually bolstered the government's case, filled in the gaps, and resolved whatever doubts arguably appear in the prosecution's case-in-chief.[11] The grand jury's questions, the government's case, and the defendant's cross-examination all relate to the absence of legal services from 1967 to 1970. In his own defense, Archer Parr testified that the payments were not intended to compensate him for any work done during those years. Rather, he explained that they were installment payments on money owed him by the District, under a contract made with Tovar, for his efforts in organizing the District around 1965. This testimony proved the government's case with respect to post-1966 payments, and put in issue whether there did in fact exist a contract to pay Archer Parr $150,000 for his pre-1966 work, with the six payments in partial satisfaction of that debt. The jury was warranted in concluding that there existed no such contract.

With these principles in mind, we review the evidence.

A. The Government's Case.

The United States offered as witnesses the two surviving members of the board of directors: Chapa and Garza. As has been pointed out, two other members are dead: Benavides and Tovar, the secretary of the board who operated the District on a day-to-day basis.

9. We have also put the test this way: A conviction by a jury should be set aside only for a manifest miscarriage of justice. United States v. Edwards, 5 Cir. 1971, 488 F.2d 1154, 1158. *See also* United States v. Fontenot, 5 Cir. 1973, 483 F.2d 315.

10. 18 U.S.C. § 1623(e) reads: "Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence."

11. When a defendant's motion for acquittal under F.R.Cr.P. Rule 29(a) is denied, and he goes forward with his own case, an appellate court reviews the whole record to determine the sufficiency of the evidence. United States v. Cashio, 5 Cir. 1970, 420 F.2d 1132, *cert. denied* 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed.2d 420.

Some have criticized the waiver rule because it supposedly forces a defendant to convict himself. Unless he is willing to take a chance that the jury will acquit him without a defense, he must go forward. This is said to deny a defendant his right to be presumed innocent, and be convicted only by proof beyond a reasonable doubt. 2 C. Wright, Federal Practice and Procedure § 463 (1969); Comment, 70 Yale L.J. 1151 (1961). But see Moore's Federal Practice ¶ 29.05. The purpose of procedural protection is primarily to prevent the conviction of the innocent. See Kaplan, Decision Theory & the Factfinding Process, 20 Stan.L.Rev. 1065, 1073–76 (1968). There is no great disservice to society in convicting the guilty in this circumstance, as long as the defendant is not forced to produce evidence of his own guilt. As the Supreme Court said in McGautha v. California, 1971, 402 U.S. 183, 215–16, 91 S.Ct. 1454, 28 L.Ed.2d 711: " . . . a defendant whose motion for acquittal at the close of the Government's case is denied must decide whether to stand on his motion or put on a defense, with the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty".

Both Chapa and Garza testified that they knew of no legal work done by Archer Parr. Chapa, president of the board, was eighty-seven years old when he testified. He and Tovar signed and countersigned all District checks. He identified his signature on the checks made payable to Archer Parr, but testified that he had no knowledge of any legal work performed by Archer Parr, nor did he know of the existence of a special account on which the checks were drawn. Garza was a board director whose regular occupation was as a roustabout on an oil rig some distance away from Duval County. He attended board meetings regularly, but did not know of any legal services performed by Archer Parr nor of any contract between the board and Archer Parr. He testified that George Parr, at a salary of $1,000 a month paid out of the operating account, was the board's attorney.

Sepulveda has been the District's office manager since 1966. He did not know of any legal work done by Archer Parr. Indeed, he testified that Archer Parr attended only one board meeting, one held February 12, 1968. He contradicted Archer Parr's testimony before the grand jury in important respects. First, he said that Archer Parr did not help him set up the District's books; he personally prepared the District's budgets from 1967 to 1970. Second, he said that no attorney was used to prepare the schedule of ad valorem taxes. Third, he too stated that George Parr, not Archer Parr, was the board's attorney. Although his job was to present bills to the board for approval and payment, he had never seen a bill from Archer Parr. He testified that he did not know of the special account until 1972. The only accounts he knew about were the Operating Account, the Interest and Sinking Fund, the Social Security Account, and the Payroll Account. One of his duties was to reconcile accounts at the bank. Bank officials never gave him the Special Account to reconcile. His testimony raises a strong inference that the Special Account was a secret account for illegal

purposes. Finally, Sepulveda could not recognize the handwriting on the check for $39,800, the only one drawn on the Operating Account.

The government produced White as its handwriting expert. He testified that "Special Account" was typed *over* Tovar's signature on the check of February 13, 1968, tending to prove that this was done *after* Tovar signed the check, perhaps by someone else. The designation "Operating Account" was obliterated from the check of February 7, 1968, and "Special Account" written in a different ink and different handwriting. One of Archer Parr's exhibits was the minutes of a board of director's meeting authorizing a payment to Archer Parr for legal fees. White testified that Jose Tovar's signature was forged on the document.

Watts, an Internal Revenue Service agent, searched the records of the board in connection with another investigation. He found no mention anywhere of any legal work done by Archer Parr, and saw his name mentioned in only two unsigned minutes of board meetings. The jury did not have to believe that they were genuine.

The government's documentary evidence showed that the Special Account was used for illegal expenditures. The ledger sheet for the District's account was blank where it should have recorded the April 1970 transaction; the stub for the check of April 13, 1970 had "void and transferred" written on it. Taken together with the other evidence, this evidence transcends mere suspicion, and warranted the jury in believing that these payments were not for any legitimate purpose, payment of legal fees or otherwise.

Cross-examination of these witnesses dented the government's case. Chapa was shown to remember very little of anything. He knew that the District had some money "on the side", that Tovar handled all the District's business, and that the District had on other occasions hired attorneys other than George Parr. Part of the cross-examination laid

the foundation for Archer Parr's contractual defense. Chapa said he knew of legal work done in connection with the formation of the District, that Tovar ran the District, and perhaps had a power of attorney.[12] Finally, Chapa testified as to Archer Parr's good reputation.

Garza also acknowledged Tovar's central role, and Archer Parr's early work. He was confronted with his sworn affidavit relating frequent consultation between Archer Parr and the District's board members. The jury did not have to conclude that he was telling the truth then and was lying now. Garza, however, did say that he discussed District business with Archer Parr from time to time. Both Garza and Chapa admitted that Archer Parr could have done legal work of which they were unaware.

Sepulveda said that Tovar ran the District, that Tovar and Archer Parr were often together, and that Archer Parr could have attended board meetings without his knowledge. Although he had never seen the checks and debit memoranda[13] crediting Archer Parr's account, he would not have questioned them. Once again in anticipation of Archer Parr's special defense, Sepulveda testified that he received District records from Archer Parr in 1966.

■ This was the state of the record when Archer Parr first made his Rule 29(a) Motion for Judgment of Acquittal. As far as either the district court or the prosecution knew, the issue was whether a reasonable jury could conclude beyond a reasonable doubt that the six pay-ments were not for legal fees for the dates between 1967 and 1970 written on the checks and debit memoranda. Archer Parr's grand jury testimony had been introduced. Read in context, it is clear that his grand jury answers related to the above years. A reasonable jury could conclude beyond a reasonable doubt that Archer Parr perjured himself before the grand jury based on: (1) Chapa's, Garza's, and Sepulveda's lack of knowledge of Parr's legal work; (2) the payments having been made from a secret account from which other illegal payments were made; (3) George Parr's having been the board's fulltime attorney; (4) the forged signatures to the board's minutes authorizing payments to Archer Parr; (5) the alteration of checks and the blank ledger sheets; and (6) the lack of any records in the District files in any way intimating that Archer Parr performed legal work in 1967–70. Had Archer Parr produced a single bill, brief, legal memorandum, or contract prepared by him for the District, or any work papers or calendars whatsoever to substantiate his legal services (whether or not those six payments were compensation for that work) a reasonable jury may have had a doubt.

**B. Archer Parr's Defense.**

■ In a criminal case, the burden of proof never shifts to the defendant. A defense, therefore, that relates to an element of the crime, and is not offered in mitigation or justification for the crime, is not an affirmative def·nse, and the prosecution must disprove it beyond a reasonable doubt.[14] Mullaney v. Wil-

---

12. Q. Now, can you tell us what Mr. Jose Tovar's duties were in the water district?
A. Well, I remember that once we gave him like a power, like to say that whenever we were not there, if he needed something, to go ahead and do it.
Q. Would that be like a power of attorney, Mr. Chapa?
A. Well, you know, he was there. I lived in Benavides. He lived in San Diego, and if he needed anything with urgency, or anything, they could deal with him right there.
Q. In other words, you authorized—the board authorized Mr. Tovar to manage the business and the water district?

A. Urgent business that needed all of a sudden.
Q. And routine business also, did you not, Mr. Chapa?
A. Yes, sir.
No such power of attorney was ever produced, and this colloquy is far from conclusive on its existence.

13. The First State Bank of San Diego calls a debit memorandum an advice of charge.

14. Archer Parr's defense sought to disprove an element of the crime, i. e. testifying falsely. It was not offered in excuse justification or mitigation.

bur, —— U.S. ——, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); Smith v. Smith, 5 Cir. 1971, 454 F.2d 572; Stump v. Bennett, 8 Cir. 1968, 398 F.2d 111 (en banc). *See* Fletcher, Two Kinds of Legal Rules: A Comparative Study of Burden of Persuasion Practices in Criminal Cases, 77 Yale L.J. 880, 902–10 (1968); ALI Model Penal Code § 1.13, Comment 3 (Tent. Draft 1954). This does not mean that the government must anticipate and disprove every conceivable line of defense in its case-in-chief. *See* W. LaFave & A. Scott, Criminal Law § 8 at 45 (1972). The issue here is whether Archer Parr presented evidence in his defense necessarily sufficient to raise a reasonable doubt in the minds of any reasonable jury. We hold that he did not.

Archer Parr's defense tried to show the possibility that the six payments in question were for his early work in organizing the District.

Wisenhunt, a tax agent for Continental Oil Co., testified that he discussed property assessments in Duval County with Archer Parr, and that Parr was knowledgable in the area. Fender, a bond broker, authenticated documentary evidence of Archer Parr's earlier work in formation of the District, told of working closely with Archer Parr and Gibson, the municipal bond attorney, and specifically of Archer Parr's work on the sinking fund. Gibson testified that Archer Parr worked with him on the proposed state legislation setting up the District, on state hearings and documents required by state law. In his opinion, Archer Parr's work was worth "a substantial fee". He said that he dealt with Archer Parr as a lawyer, not as County budget officer. Cuellar, the Duval County Tax Collector, told of requesting Archer Parr's help in collecting delinquent taxes for the District. Aguayo,

engineer Trimble's secretary in 1964, substantiated Archer Parr's work with Trimble in formation of the District, testified that they both attended budget meetings, and that Archer Parr was the moving force behind the District. Peterson, a drilling contractor, consulted with Archer Parr on District business in 1965–66, and affirmed that Archer Parr was knowledgable in his field. Archer Parr's half sister, Ellis, an office worker at the District in 1970, told of seeing legal pads with legal citations in the office; Vera, who worked in Tovar's store, told of carrying boxes from the District office to Tovar's basement, and that they were destroyed and discarded after a flood. Ellis's bias is obvious, and the jury need not have deduced that those boxes contained the definitive evidence of Archer Parr's work for the District.

Archer Parr took the witness stand in his own defense. He restated that he helped organize the District, that he prepared the budget with Trimble, helped collect ad valorem taxes, and helped set up the bonded indebtedness schedule.[15] He then asserted for the first time that he had a contract with Tovar, entered into after considerable haggling, for $150,000 in legal fees for his *pre*-1966 work. He said that he received none of this amount between 1965 and 1968 because the District had no money to pay him. Thereafter he asked for money when he needed it. He emphatically denied ever channeling money to George Parr.[16] He denied that he gave the instructions on the debit memorandum "per instructions of Archer Parr"; that Goldthorn probably gave this instruction.

The United States Attorney effectively cross-examined Parr. The defendant admitted that he had not been paid for post-1966 work,[17] and explained his fail-

---

**15.** Archer Parr's reference to his $60 per hour fee apparently was aimed at showing that he overcharged the district for very little in legal services, but was not lying when he testified that the payments were for legal work.

**16.** Of course, what Archer Parr did or did not do with the money is irrelevant to the question whether he lied to the grand jury.

**17.** See, e. g., the following testimony given during the government's cross-examination of Archer Parr:

A No, sir. As I said, Mr. Sessions, this was back from the time of the inception of the district. I made an agreement with Mr. Tovar for a fee of $150,000 for the execution— getting all the district together, getting the

ure to tell the grand jury about the contract by saying that he was not asked about it. Having denied that he formed the District before the grand jury, he now explained that he could not form a district, only the legislature could. He denied being employed by the District before the grand jury because he could not be employed by the District before it was created.[18]

Parr's explanation that the six payments in question were installments on a contract entered into for the District by Tovar to pay him $150,000 was singularly unconvincing. No written contract and no resolution of the board was ever produced at trial. Archer Parr told the grand jury that he billed on an hourly basis, at the rate of $60 an hour, but never submitted bills. He merely requested money when he needed it. Before the petit jury Archer Parr explained that he worked on a flat fee, that he submitted no formal bills, although he bills his other clients, and knows of no other lawyers who do not

keep records or submit bills for services. Parr explained that he trusted Tovar to keep track of how much of the fee was still owed him. He said that he waited until 1967 to ask for the first installment because the District had no money to pay him in the beginning. The government introduced evidence showing that the District was funded with $2,500,000 from the bond sale on October 13, 1965. Archer Parr contended that he worked on the budget, and was entitled to compensation for that work. He did not know that the District could have paid him in full then. Nor did he know that there were *two* bond issues.

The government's cross-examination of Fender showed him to be Gibson and Archer Parr's partner in organizing the District for their mutual profit. Fender earned a considerable fee for his work in marketing the District bonds. He paid George Parr $40,000 and Archer Parr $170,000 for City of Benavides bonds that were barred in bankruptcy, i. e. were worthless. Indeed Fender never even received these bonds.[19] These pay-

---

bonds, having the elections and all the rest of the stuff. I thought that I had done twice the amount of work that Mr. Gibson did. Mr. Gibson got a fee of $75,000. I thought I was entitled to a fee of twice that because I did twice the work, sir.
Q You said you made an agreement with Mr. Tovar?
A Yes, sir.
Q This was at the inception of your work that—
A No, sir. It was at the time when—
Q When did you make that agreement then with Mr. Tovar?
A I would say probably 1965.
Q Of $150,000 for your work that you had done to that point?
A That is correct, sir.
　　　*　　*　　*　　*　　*　　*
Q It was again for a portion of the hours that you had spent?
A This was for legal work that I performed, sir, in 1963, '64, '65, and '66 for the water district, sir.
Q You said that you charged by the rate of $60 an hour. Then did you subtract that amount from all those hours you had spent?
A No, I didn't do that, doing that on an hourly basis, because Mr. Tovar and I agreed on a fee of $150,000, sir, for all the time that I had spent.

Q I thought you told the jury yesterday that Mr. Tovar and you could not agree on a fee.
A Well, I agreed. He didn't. We kind of disagreed about it, but he agreed—he agreed to—finally agreed to pay me that much money, yes, sir.
Q Oh, I see. All right. Now, this bill of $23,700 would represent about 395 hours of work, would not?
A I would not know if it would, sir.
Q About 395 or 400?
A I will take your calculation, sir.
Q That was for—billing for time, so far as the checks were concerned, that you could see, from February of '69 until June of 1969?
A No, sir, Mr. Sessions. This was for work that I had done from '63 through '66, sir.
Q Well, the check that you were paid in February of '69 says "For legal services rendered in year 1968."
A I can't help what the checks says, Mr. Sessions. I did not write the check out. I knew nothing about the resolution of the Board of Directors either, sir.

18. In fairness, Archer Parr once did analogize his work to the promotion of a corporation.

19. The government suggests that the payment was really a bribe.

ments could explain why Archer Parr worked to establish the District.

The government showed that one of the letters dealing with bond ratings was signed by Archer Parr in his official capacity as county judge and budget officer. Fender admitted that it would fall within Archer Parr's official functions to see to it that the new water district's bonds were highly rated, for this would help the ratings on the bonds of all the taxing entities of Duval County, with reference to which Archer Parr had direct and official responsibility. Fender was no detached and expert witness. He was biased and interested, or so the jury could conclude.

Gibson knew of no contractual relationship between Tovar and Archer Parr. He knew of no post-1966 work done by Archer Parr. He admitted that he alone was responsible for the legal end of organization of the District; that was why he was paid $75,000.

Sepulveda and Parrish testified the bonded indebtedness schedule, was prepared by Sepulveda alone, using a commercial publication, the Texas Municipal Reports, and simple calculation. Indeed almost every item of District work for which Archer Parr claimed credit was either done by someone else or so simple that it could not be considered legal work.

Viewing this evidence in the light most favorable to the verdict, we must conclude the government proved to the jury's satisfaction beyond a reasonable doubt that the six payments in question were not, as stated on the face of the documents, for legal work between 1967 and 1970. Archer Parr admitted this in his own case. The evidence that a contract existed between Archer Parr and Tovar does not compel a reasonable doubt that these payments were installment payments. The issue was directly put to the jury by the trial court in its instructions.[20]

The evidence, viewed as a whole, was sufficient for the jury to convict Archer Parr of perjury.

## II

## MATERIALITY

Archer Parr asserts that he is entitled to acquittal on count one, relating to questions asked at his second grand jury appearance on April 6, 1973, because the questions were not material. He argues that, because the grand jury had determined on that day to indict George Parr, "the Grand Jury's investigation relating to George Parr necessarily was completed prior to April 6, 1973." Furthermore, he alleges that the true purpose of the questions in his second appearance was to entrap him in perjury. A grand jury has leeway in its investigation. As the Second Circuit Court of Appeals has said:

"A grand jury's investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed,".

United States v. Stone, 2 Cir., 1970, 429 F.2d 138, 140.

---

**20.** Over the government's objection, the district court instructed the jury on Archer Parr's special defense.

". . . [T]he defendant, Archer Parr, specifically contends that the Duval County Conservation and Reclamation District agreed to pay him, Archer Parr, a fee of $150,000 for legal services rendered the water district—that is, the Duval County Conservation and Reclamation District, and that the payments of $121,500 were on such account, with the balance being still due and unpaid to him by the Duval County Conser-

vation and Reclamation District. Therefore, the defendant, Archer Parr, contends that his declarations to the Grand Jury were true. If you believe such contentions of the defendant, Archer Parr, or if you have a reasonable doubt in regard thereto, then you must acquit the defendant, Archer Parr, of all counts of the indictment and so say by your verdict."

The trial judge warned of the dangers of a special defense if it is not believed—it can end up hurting the defendant. Nonetheless, Archer Parr's counsel enthusiastically approved it.

In his first appearance, Archer Parr agreed to bring documents to substantiate his earlier claim that he performed legal services. He had sent a letter on October 15, 1973 to the United States Attorney noting an additional payment of $39,800, out of the Operating Account that the grand jury did not know about. If, as the grand jury suspected, this money went to George Parr, the return of the indictment could have been delayed, or a superseding indictment could have been returned at a later date.

Archer Parr phrases the issue as whether (1) the payments were for legal fees or (2) were really for the benefit of George Parr. But the only question is whether Archer Parr committed perjury, not what he did with the money. In oral argument, counsel for Archer Parr stressed that the grand jury never asked him whether the payments were for the benefit of George Parr, an indication of the government's bad faith. The government responds that the question was unnecessary in light of the defendant's explanation.

Materiality poses a question of law for the Court. United States v. Edmondson, 5 Cir. 1969, 410 F.2d 670, *cert. denied*, 396 U.S. 966, 90 S.Ct. 444, 24 L.Ed.2d 430. The test of materiality is whether the false testimony was capable of influencing the tribunal on the issue. Barnes v. United States, 5 Cir. 1967, 378 F.2d 646, *cert. denied*, 390 U.S. 972, 88 S.Ct. 1056, 19 L.Ed.2d 1184. Because the question related directly to the grand jury's investigation, the district judge was correct in ruling that the question was material.

### III

### THE TRUTHFULNESS OF THE ANSWER IN COUNT FOUR

Archer Parr stresses that "precise questioning is imperative as a predicate for the offense of perjury", Bronston v. United States, 1973, 409 U.S. 352,

362, 93 S.Ct. 595, 602, 34 L.Ed.2d 568. He contends, therefore, that the question ". . . how much time in representation of the Conservation and Reclamation District it may have involved on your part in 1968, '69 and—'67 on ?" is ambiguous, and he interpreted it to mean from 1967 *back*. He asserts that he proved that he worked three months per year between 1963 and 1967, and that his answer was therefore true. We disagree. Read in context, it is clear that Archer Parr understood the question to mean from 1967 forward.[21] The jury was instructed to acquit the defendant if it thought that the answer was made "because of an accident, mistake, or other innocent reason." The jury resolved this issue against the defendant.

### IV

### THE CLOSING ARGUMENT

The Assistant United States Attorney who tried the case used the following language in closing his argument:

Now, what else is this case about? . . . It's about a secret account that only he and George Parr and Jose Tovar and Barney Goldthorn, the President of the bank knew anything about. Incidentally, the Government's Exhibit on these advices of charge, that shows an explanation column that it was drawn as per instructions of Archer Parr—$14,000—and Archer Parr says: 'Well, that must be a mistake; that's not true; I never ordered anybody to order the bank to pay me $14,000 out of that account. That's a mistake.' Did he bring Barney Goldthorn up here to tell you, ladies and gentlemen 'I made a mistake; it didn't happen that way? No. And you are entitled to draw inferences about why he didn't bring Barney Goldthorn to testify and explain that peculiar entry that shows he had authority and jurisdiction over that account. I submit he did because he knew Barney Goldthorn

---

21. Counsel for Archer Parr on appeal was mistaken when he quoted the question, at oral argument, as "1969, 1968, 1967 on", stressing the descending chronological order.

would tell you ladies and gentlemen it means what it says: 'I transferred those funds'—

MR. GILLESPIE: I object to that, Your Honor, I object to that because he knows full well who subpoenaed Barney Goldthorn and it wasn't us.

THE COURT: Overruled.

The defendant insists that this statement constituted reversible error. Goldthorn was originally scheduled to testify for the government. When the prosecution notified the defense that it did not plan to call him, the defense refused to release him. The debit memorandum of February 2, 1968, read "To transfer funds to Archer Parr, as per instructions of Archer Parr". Parr's explanation, during cross-examination, of how that got there was that "Mr. Goldthorn did that". He did not call Goldthorn to testify to that, even though the record reveals that they were good friends, that Goldthorn was Archer Parr's personal banker, that the District's sizable account was kept at the bank, and that the only other living person besides the defendant who knew of the existence of the Special Account was Goldthorn. Goldthorn was present and available at the trial.

■■■ Failure to produce a favorable witness peculiarly within a party's power creates an inference that his testimony would be unfavorable. McClanahan v. United States, 5 Cir. 1965, 230 F.2d 919, 925, *cert. denied,* 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47; United States v. Johnson, 1 Cir. 1972, 467 F.2d 804, 809, *cert. denied,* 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270. The prosecution did not request an instruction on this inference, nor did Parr's attorney demand a mistrial, expressly object to the inference,[22] or request a curative instruction.

■■■ More fundamentally, this incident, part of a long and well-conducted trial,[23] was so tangential to the central issues of the case that, in our view, it was at worst harmless error. F.R. Crim.P. Rule 52(a). "A defendant is entitled to a fair trial, but not a perfect one." Lutwak v. United States, 1953, 344 U.S. 604, 620–21, 73 S.Ct. 481, 97 L.Ed. 593. The arguments of counsel are not evidence, and the trial judge so instructed the jury. *See* United States v. Young, 1972, 150 U.S.App.D.C. 98, 463 F.2d 934, 943.

V

## MISREPRESENTATION

■■■ Parr asks this Court to invoke its supervisory power to remedy what it calls "outrageous prosecutorial misconduct". He alleges that the United States Attorney deliberately misrepresented what he knew to be Goldthorn's testimony by implying that it would have been unfavorable to the defendant, when in reality it would have corroborated Archer Parr's testimony. Goldthorn appeared before the grand jury. On August 8, 1972, he testified that Archer Parr initiated the transfer of $14,000 by the debit memorandum of February 2, 1968. Later, on September 13, 1972, he testified that Tovar initiated the transfer at Archer Parr's request. Each story differs from the defendant's testimony that he had nothing to do with the transfer of funds. While the second version would be less unfavorable to him than the first, neither would help him. In any case, we disagree that it was "a major element of the government's thesis that Parr controlled the District's Special Account." Viewing the prosecutor's comment in "the context of the entire trial, and not in isolation," United States v. Phillips, 8 Cir. 1973, 482 F.2d 191, 196, *cert. denied,* 414 U.S. 1114, 94 S.Ct. 846, 38 L.Ed.2d 741, we hold

---

**22.** *See* United States v. Webb, 5 Cir. 1973, 463 F.2d 1324, *cert. denied,* 409 U.S. 986, 93 S.Ct. 338, 34 L.Ed.2d 251; United States v. Miceli, 1 Cir. 1971, 446 F.2d 256.

**23.** The prosecutor's remark was a small part of 26 transcript pages of his closing argument. The trial, which took two weeks and five volumes of transcript to complete, was hard fought and well tried.

that Archer Parr was not deprived of a fair trial.[24]

## VI

## THE RECANTATION PROVISION

█ Archer Parr was given the *Miranda* warning. In addition to this, he contends that he should have been informed of the recantation provision of 18 U.S.C. § 1623(d).[25] He cites United States v. Lardieri, 3 Cir. 1974, 497 F.2d 317. There the court held that where the prosecutor *threatens* a witness with a perjury conviction, fairness requires that he also be informed of his right to recant. On rehearing, the panel reversed this holding. 506 F.2d 319. Judge Weis, dissenting, stressed the narrowness of the original holding. 506 F.2d at 325. Here, Archer Parr was neither threatened nor warned. And he had not raised the issue by pretrial motion under Rule 12(b)(2). We see no reason to grant relief from the waiver under that rule.

## VII

## CONCLUSION

The record compels this Court to conclude that Archer Parr's perjury impeded the grand jury's attempt to determine whether the activities of George and Archer Parr violated federal law. Archer Parr could ask for money from the District "when [he] needed it". A petit jury could reasonably conclude that the payments to Archer Parr were not for legal services or any other legitimate purpose; that Archer Parr perjured himself in his testimony before the grand jury.

Affirmed.

**24.** Indeed in *Phillips* the court held that a statement by the prosecutor implying that the government prosecutes only the guilty was held to be harmless error, when taken in context.

**25.** 18 U.S.C. § 1623(d) reads:
Where, in the same continuous court or grand jury proceeding in which a declaration

is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.