UNITED STATES of America,
Plaintiff-Appellee,

v.

Fred O. BROOKS, Defendant-Appellant.

No. 81–7704.

United States Court of Appeals,
Eleventh Circuit.

April 25, 1983.

Rehearing and Rehearing En Banc
Denied Aug. 3, 1983.

Vance, Circuit Judge, filed opinion concurring in part and dissenting in part.

---

Joseph Beeler, Miami, Fla., John R. Martin, Atlanta, Ga., for defendant-appellant.

Joseph D. Newman, Frederick Kramer, G.R. Smith, Asst. U.S. Attys., Savannah, Ga., for plaintiff-appellee.

Before FAY and VANCE, Circuit Judges, and ALLGOOD *, District Judge.

ALLGOOD, District Judge:

On May 21, 1981, Fred Brooks, Roberto Cordero, and Guido Drago were indicted for various drug violations under Titles 18 and 21 of the United States Code.[1] Following a jury trial, Cordero and Drago were acquitted of all charges and Brooks was convicted on three counts of the eight count indict-ment. Brooks was found guilty of violations under 21 U.S.C. §§ 952(a) and 960 (Count Four) for importing approximately eleven pounds of cocaine, 21 U.S.C. § 843(b) (Count Six) for using a telephone to facilitate a conspiracy to possess the cocaine with the intent to distribute, and 18 U.S.C. § 1952(a)(3) (Count Seven) for traveling in interstate commerce for the purpose of facilitating the importation and distribution of the cocaine.[2]

Fred Brooks raises two issues on appeal. He first contends that there was insufficient evidence to support the jury's guilty verdict on each of the three counts stated above. He further asserts that he was subjected to an unlawful search and seizure in violation of his Fourth Amendment rights. We conclude that there is no merit to appellant's search and seizure challenge and we therefore turn our attention to his attack on the sufficiency of the evidence. We find it necessary to detail the precise occurrences which led to Mr. Brooks' arrest and subsequent conviction.

On May 2, 1981, a Peruvian vessel, the INCA PACHACUTEC, entered the port of Savannah, Georgia. The vessel docked at the Georgia Ports Authority's Ocean Terminal.[3] The United States Customs Patrol Office (CPO) established surveillance on the vessel immediately upon its arrival in the Savannah Port because the vessel had previously been used to import cocaine into the United States and it had arrived directly from one of the source countries for cocaine.[4]

At approximately 8:00 p.m., on the evening following the vessel's arrival, Robert Clark, a Customs Patrol Officer, observed an individual leave the ship and approach a

---

1. Another defendant, Carlos Rivera-Arteaga, was also indicted. He did not, however, go to trial with Cordero, Drago and Brooks because at the time of trial, he was undergoing a psychiatric evaluation pursuant to a court order.

2. All of the defendants were acquitted on the conspiracy counts alleging violations under 21 U.S.C. § 846 (conspiracy to possess with intent to distribute) and 21 U.S.C. § 963 (conspiracy to import a controlled substance).

3. The vessel was formally cleared through United States Customs on May 4, 1981.

4. Kelly Goodowens, an agent with the Drug Enforcement Administration (DEA) testified that the three main source countries were Peru, Bolivia, and Colombia.

nearby telephone. Before a call was completed, a black automobile approached the individual whereupon he got inside the vehicle. The automobile then proceeded to exit the dock through the main gate. At approximately 9:15 or 9:20 p.m., the automobile returned to the dock and pulled alongside the ship. The individual, who had earlier exited the vessel, got out of the car and very hurriedly reboarded the ship. The car remained parked beside the vessel for approximately fifteen minutes, when the individual once again exited the ship and got back into the car.

As the vehicle proceeded toward the main gate, Officer Clark radioed the gate officer and requested that the car be stopped and held until he arrived at the gate. Upon his arrival, Officer Clark requested identification from both the driver and the passenger. The passenger provided Officer Clark with identification indicating that his name was Carlos Rivera-Arteaga and that he was a crew member of the INCA PACHACU-TEC. During the course of a pat-down search, Officer Clark discovered that Rivera had two packages, wrapped in pink plastic, concealed underneath his shirt in an elastic belt or "belly band." The packages contained two and a half pounds of ninety-eight percent pure cocaine hydrochloride.

The discovery of the cocaine on Rivera's person prompted Officer Clark to board the INCA PACHACUTEC and search his quarters. Packages, similar to the ones found on Rivera, were discovered in his closet and dresser drawer. These packages contained approximately five and a half pounds of cocaine of a grade and purity similar to the cocaine concealed on Rivera's person. After discovering the cocaine, customs officials requested the assistance of the DEA.

Thomas Sprague, a DEA agent, went to the Ocean Terminal and was apprised of the situation and informed that Rivera had been arrested. After advising Rivera of his constitutional rights, agent Sprague questioned him. Rivera told agent Sprague that he was a crew member of the INCA PACHACUTEC and that at the time of his arrest he was attempting to deliver the cocaine to a Peruvian national named Guido in Room 130 of the Dreamland Motel.[5]

After questioning Rivera, agent Sprague and three other officers went to the Dreamland Motel. The owners of the motel informed the agents that Room 130 was registered to a man named "Cordero" and that he and another individual had registered during the early morning hours of May 3, 1981. The agents also learned that there had been two long distance phone calls made from Room 130. One call was to a Miami, Florida area code and the other was to Peru.[6]

At approximately 12:00 a.m. agent Goodowens and two customs patrol officers arrested the two individuals occupying Room 130. They identified themselves as Roberto Cordero and Guido Drago. The agents took the two men to the customs office. After being apprised of their constitutional rights, agent Sprague requested the men furnish certain biographical information. Both men stated that they were Peruvian citizens and that they had entered the United States on May 2, 1981 at Miami, Florida.[7]

On the morning of May 4, 1981, agent Goodowens secured a search warrant for both Room 130 and 125 at the Dreamland Motel. In searching Room 125, agent Goodowens found two packages of cocaine concealed under a mattress. In addition, agent Goodowens recovered an envelope which contained the airline tickets, passports, and

5. Rivera's statements were admitted into evidence at trial, but the court instructed the jury that his statements were only to be considered to explain why certain agents acted in a particular manner. The trial court also instructed the jury that the statements should not be considered for the truth of the matter asserted.

6. The owners of the motel also told the agents that Room 125 had been reserved by one of the

two men in Room 130. Room 125 had been registered in the name of "Jorge Fuller" because the owner required the room to be registered in the name of the person who was to occupy it.

7. Each man stated that he had lost his Peruvian passport and immigration visa.

immigration visas of both Cordero and Drago. He also found two address books and some identification cards. The airline tickets established that Cordero and Drago had flown into Miami from Lima, Peru on May 2, 1981. After a brief stay at Miami's DuPont Plaza Hotel (Room 724), the two men departed Miami at 9:15 p.m. for Savannah via Atlanta. The plane was to arrive in Savannah at approximately 2:30 a.m.

The search of Room 130 revealed several documents. One of the papers, a piece of DuPont Plaza stationery, had a handwritten inscription on it which listed the name "Fred" and the number "914–3449". The agents determined later than this number, when read from right to left (944–3419), was a telephone number registered to Fred Brooks' wife in Hallandale, Florida. The telephone records of the Dreamland Motel established that this number was called from Room 130 immediately after Drago and Cordero arrived. This same phone number and the name "Fred" was also written in one of the address books recovered from Room 125. In addition, on the back of the address book the name "Fred" was written again with another transposed telephone number. This number corresponded to another telephone number registered to Fred Brooks' wife. The second address book contained these same inscriptions and numbers.

Pursuant to the investigation at the Dreamland Motel, the drug agents learned that on May 3, an individual had called and left a message for the occupants of Room 130 that "Fred called." This prompted the DEA agents to request the motel switchboard operator to tell Fred, the next time he called, to meet the people in 130 at the airport at 1:00 p.m. This message was relayed to Fred on his next call. Fred later called the motel and said he had not seen the people at the airport.[8]

Later in the afternoon of May 4, Fred called the Dreamland Motel and left a tele-

phone number where he could be reached. The number he gave was a Garden City exchange registered to a pay phone across the street from the Land of Oaks Motel. The DEA agents subsequently attached a recording device to the telephone in Room 130 and a Spanish speaking officer called the number Fred had left. Soon after Fred answered the phone, he asked to speak to Roberto. When the officer, who was impersonating a companion of Roberto's, told Fred that Roberto was not there Fred became angry and demanded that Roberto be available to speak to him within fifteen minutes. Fred called the room on two more occasions attempting to contact Roberto. Finally, he stated that he did not like the situation too much and hung up the phone in disgust.

At approximately 6:30–6:45 p.m., an employee of the Land of Oaks Motel informed customs officer Bobby Masters that Brooks had just left the motel. A description of Brooks and the vehicle, in which he was riding, was radioed to a surveillance unit. The vehicle was found at a nearby shopping center. As soon as Brooks returned to the vehicle, DEA agents approached the vehicle for an investigatory stop and pat-down search for weapons.

The officers asked Brooks for identification and questioned him as to the ownership of the vehicle and a vinyl suitcase, which was visible in the rear of the vehicle. Brooks denied ownership of either the vehicle or the suitcase and further stated that proof of his identification was in his motel room at the Land of Oaks Motel.[9] The officers asked Brooks to go to his motel room and produce the proper identification. Upon going to his room, Brooks produced his driver's license from a briefcase he had underneath his bed. The officers then asked Brooks to accompany them to the customs office for further questioning.

---

8. A Customs Patrol Officer testified that he was in the Savannah airport on May 4, 1981 and that he had seen Fred Brooks passing through the airport at approximately 1:00 p.m.

9. A license check was run on the vehicle while the officers questioned Brooks. The check revealed that the vehicle was registered to a known contraband smuggler.

Brooks agreed and they all departed for the customs office.[10]

After arriving at the CPO headquarters, Brooks was again questioned about the vehicle and the suitcase. When no satisfactory answers were obtained, a trained drug detection dog, "Sgt. Blitz," was summoned to sniff the vehicle, the suitcase, and Brooks' briefcase. "Sgt. Blitz" alerted on the rear of the vehicle, near the suitcase and on Brooks' briefcase. A search warrant was obtained for all three objects and they were subsequently searched.

The search of the briefcase revealed $15,700 of United States currency, some Peruvian money, an airline ticket, Brooks' passport and various papers.[11] The papers contained a handwritten note indicating the telephone number of the Dreamland Motel and Room 130. It also contained the name "DuPont" and the number "724." Other handwritten notes, including an address book, contained the names "Roberto Cordero" and "Gido" [sic] and a telephone number. The briefcase also contained a set of small keys, one of which fit the lock on the vinyl suitcase. Upon searching the suitcase, the agents found various objects that are used to test the purity of cocaine. Among them were a melting point apparatus known as a "hot box," a magnifying glass and a bottle of methyl alcohol.[12]

Testimony at trial indicated that the wholesale value of eleven pounds of cocaine, similar in quality to that confiscated in this case, would be approximately $330,000. After it had been diluted and made ready for sale to individual buyers, the eleven pounds of cocaine would have provided several million dosage units.

At the conclusion of the Government's evidence and at the close of the trial, Brooks moved for a judgment of acquittal on all counts in the indictment. His motions were denied and the case was submitted to the jury. Brooks contends that the foregoing facts were insufficient for a reasonable jury to have found him guilty on any count in the indictment.

■ When reviewing a challenge to a criminal conviction based on the sufficiency of the evidence, this court must view the evidence in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Applying this standard of review, we are obliged to uphold a verdict which is supported by substantial evidence. *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590, 624–25 (1974).

■ With respect to appellant's attack on his convictions for importation of cocaine under 21 U.S.C. §§ 952(a) and 960 (Count Four) and for traveling in interstate commerce to facilitate the importation of cocaine under 18 U.S.C. § 1952(a)(3) (Count Seven) we find that sufficient evidence exists to support the guilty verdict. Appellant contends that there are numerous hypothesis of innocence which should necessarily have created a reasonable doubt as to his guilt under these two counts. This, however, is not a proper ground to set aside a jury verdict of guilty.

■ As stated by our court in *United States v. Bell,* 678 F.2d 547, (5th Cir.1982) (Unit B en banc), cert. granted —— U.S. ——, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982), not every hypothesis of innocence must be excluded "provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *Id.* at 549.

In resolving the reasonable doubt question, we are guided by the enunciation of the court in *United States v. Parr,* 516 F.2d 458, (5th Cir.1975). In *Parr* the court stated

We must keep in mind that our review does not turn on whether this Court thinks the evidence is sufficient, but whether a reasonable jury could so con-

---

**10.** For some undisclosed reason, Brooks took all of his luggage with him to the CPO.

**11.** The airline ticket was in the name "Fred Miller" and indicated a flight from Fort Lauder-

dale, Florida to Savannah via Atlanta on May 4, 1981, arriving at approximately 11:30 a.m.

**12.** The "hot box" contained cocaine residue from undisclosed previous testing.

clude beyond a reasonable doubt. See 2 C. Wright, Federal Practice & Procedure § 467 at 259. Issues of credibility, the weight of evidence, and conflicts in evidence are, of course, matters for the jury. See 4 Jones on Evidence, §§ 29:9–13 (6th Ed.1972). Furthermore, a jury may believe only part of a story, and disbelieve another part. *United States v. Edwards,* 5 Cir.1974, 488 F.2d 1154, 1158.

After carefully reviewing the entire record and applying the standards set forth in *United States v. Bell, supra,* and *United States v. Parr, supra,* we find that sufficient evidence was presented to permit a reasonable juror to find the appellant guilty beyond a reasonable doubt on Counts Four and Seven.

We hold that appellant's conviction under 21 U.S.C. § 843(b) (Count Six) must be reversed as a matter of law. Count Three of the indictment charged that Fred Brooks had conspired with Roberto Cordero Guido Drago, Carlos Rivera-Arteaga, and other unknown individuals to "possess with intent to distribute approximately 11 pounds of cocaine hydrochloride." Count Six charged that

> On or about the 4th day of May, 1981, in Chatham County, within the Southern District of Georgia, FRED O. BROOKS, aka FRED MILLER, knowingly and intentionally did use a communication facility, that is, a public telephone, *in facilitating the knowing, intentional and unlawful conspiracy by GUIDO DRAGO, ROBERTO CORDERO, and CARLOS RIVERA–ARTEAGA, to possess with intent to distribute approximately 11 pounds of cocaine hydrochloride,* a Schedule II Controlled Substance, a felony under Title 21, United States Code, Section 846, in that FRED O. BROOKS, aka FRED MILLER, wanted to speak with ROBERTO CORDERO immediately; done in violation of Title 21, United States Code, Section 843(b). (Emphasis added).

After hearing all the evidence in this case, the jury acquitted all defendants on Count

Three but returned a guilty verdict against appellant under Count Six.

■ Section 843(b) provides:

> It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter.

The issue before this court is whether a conviction under § 843(b) can stand as a permissible inconsistent verdict when the defendant has been acquitted of the underlying felony upon which the facilitation charge was founded. We hold that it cannot.

■ Where an indictment charges a specific conspiracy in one count and in a separate count charges a § 843(b) violation in furtherance of that same conspiracy, the permissible inconsistent verdict rule, *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), cannot operate to sustain a conviction for a § 843(b) violation if the defendant is acquitted of the underlying conspiracy. This same question was presented to the Third Circuit Court of Appeals in *United States v. Hannah,* 584 F.2d 27 (3rd Cir.1978). The *Hannah* court reasoned that the permissible inconsistent verdict rule should not apply under these facts because the conspiracy count and the facilitation count could not be viewed as separate and distinct indictments. We find that rationale to be wholly consistent with our understanding of the permissible inconsistent verdict rule and we agree that the rule should not be applied in this limited fact situation.

In the recent case of *United States v. Ramos,* 666 F.2d 469 (11th Cir.1982), this court indicated it would apply the *Hannah* rationale in the "unique situation" where "the defendant has been acquitted of the underlying crime while having been convicted of using a telephone to commit that crime." *Id.* at 476. We find that this "unique situation" exists in the case at bar. When the jury acquitted Brooks of conspiracy, the felony relied upon by the Govern-

ment to support the felony requirement of § 843(b), the Government's proof was insufficient as a matter of law to uphold a conviction under Count Six.

We have carefully considered the appellant's contention that his acts, even when viewed in the light most favorable to the Government, constituted nothing more than "mere preparation" to commit a crime. *United States v. Joyce,* 693 F.2d 838 (8th Cir.1982). We find the evidence sufficient to support the appellant's conviction under Count Four since the Government only had to prove that he aided and abetted the importation of cocaine, not that he committed every act constituting importation. *United States v. Pearson,* 667 F.2d 12, 13 (5th Cir.1982). We further hold that sufficient evidence exists to support appellant's conviction under Count Seven because proof that he attempted to facilitate the distribution of cocaine after traveling in interstate commerce is sufficient to support a conviction under 18 U.S.C. § 1952(a)(3). *United States v. Jones,* 642 F.2d 909, 912 (5th Cir. 1981). Because we find sufficient evidence existed upon which the jury could reasonably have found appellant's action went beyond "mere preparation" and constituted an attempt, we find *United States v. Joyce, supra,* inapposite.

For the reasons stated above, we REVERSE appellant's conviction under Count Six and AFFIRM his convictions under Counts Four and Seven.

VANCE, Circuit Judge, concurring in part and dissenting in part:

In my view the evidence against Brooks barely, but just barely, supports his conviction under Count Seven. I am unable, however, to perceive wherein the evidence supports his conviction under Count Four of having aided and abetted the importation of cocaine. I therefore concur in the majority's reversal of Brooks' conviction under Count Six and its affirmance of his conviction under Count Seven, and I dissent from its affirmance of his conviction under Count Four.